UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LARRY CRAWFORD,<br>　　　*Plaintiff,*<br>　　　*v.*<br>NATIONAL　　　RAILROAD　　　PASSENGER<br>CORPORATION a/k/a AMTRAK,<br>　　　*Defendant.* | Civil No. 3:15-cv-131 (JBA)<br><br>December 4, 2015 |

**RULING GRANTING DEFENDANT'S MOTION TO DISMISS**

This is an action by Plaintiff Larry Crawford against his employer, National Railroad Passenger Corporation ("Amtrak"), alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count One), retaliation in violation of Title VII of the Civil Rights Act of 1964 (Count Two), and intentional infliction of emotional distress (Count Three).[1] Amtrak now moves [Doc. # 34] to dismiss all counts, on the grounds that they do not state a claim for which relief can be granted. Oral argument was held on November 20, 2015. For the following reasons, Amtrak's motion is granted.

**I.　　Factual Allegations**

Plaintiff alleges the following facts in his Second Amended Complaint [Doc. # 29]. Plaintiff was hired as a CNS Signalman by Amtrak on November 12, 1997, and subsequently promoted to the position of Engineer. (2d Am. Compl. ¶ 8.)

**A.　The Email**

On February 9, 2011, Mr. Crawford received an email, sent by a white co-worker, Conductor Stephen Bruno, while Mr. Bruno was operating Train No. 177. (*Id.* ¶¶ 10–11.) The

---

[1] Plaintiff has withdrawn his claim for negligent infliction of emotional distress (Count Four). (*See* Pl.'s Suppl. Br. [Doc. # 38].)

email contained a picture of a donkey and the message, "Just thought u might like to kiss my ass . . . nigger." (*Id.* ¶ 11.) Plaintiff reported the incident on February 10, 2011 to Steven Seibert, an Amtrak employee (whose position is not specified) in New York, who forwarded the report to Amtrak's Dispute Resolution Office ("DRO") in Boston. (*Id.* ¶ 13.) The DRO placed Mr. Bruno on administrative leave while it investigated the incident. (*Id.* ¶¶ 14, 16.)

On February 13, 2011, Mr. Crawford overheard a white conductor discussing Plaintiff's DRO complaint, stating: "I don't see what the problem is; they call each other ['nigger'] all the time anyway!" (*Id.* ¶ 29.) Plaintiff additionally learned from an African-American co-worker that "in or around 2011" "she was approached by white colleagues who used the word 'Nigger' in her presence and stated they didn't believe 'the N word' was a big deal because 'black people call each other Niggers all the time.'" (*Id.* ¶ 32.)

"Some of plaintiff's Caucasian co-workers warned/threatened [Mr. Crawford] not to file a complaint against [Mr.] Bruno, claiming 'it was no big deal; get over it!'" and on February 15, 2011, John Butler, another white conductor "threateningly advised the plaintiff that he and [Plaintiff's] son (who also works for the defendant) would 'have a very tough time out here, because Bruno is very well liked out here.'" (*Id.* ¶¶ 24, 30.)

On February 18, 2011, the DRO concluded that Mr. Bruno had violated two of Amtrak's polices: 1) use of an electronic device while conducting a train; and 2) violating Amtrak's policy prohibiting racial harassment. (*Id.* ¶ 17.) A hearing was scheduled but subsequently canceled after Mr. Bruno refused to cooperate with the DRO investigation. (*Id.* ¶¶ 18–20.) Amtrak suspended Mr. Bruno for thirty days. (*Id.* ¶ 21.)

On February 24, 2011, at the CT-DOT shop, a white conductor "threateningly told the plaintiff that there was a 'Brotherhood around here,' in reference to a brotherhood of Caucasian

employees," and told Plaintiff he "'should have handled things differently' with [Mr.] Bruno." (*Id.* ¶ 31.) When, on March 3, 2011, Mr. "Bruno returned to work and was allowed to continue to work along side [sic] the plaintiff," Plaintiff's co-workers "proclaimed to him 'We told you so!'" (*Id.* ¶¶ 22, 24.) Plaintiff has also "come to learn, through . . . co-workers, . . . that many" of his white co-workers "have refused to speak with him because he complained of [Mr.] Bruno's racist behavior to [the] DRO." (*Id.* ¶ 33.) "[T]hese white employees have repeatedly engaged in racially insensitive and, in some cases, obtrusive discriminatory behavior and have not been disciplined." (*Id.*)

On March 18, 2011, Mr. Crawford notified his supervisor, Frank Guadalupe, that "the events with [Mr.] Bruno had caused him severe stress and anxiety arising from both the incident itself and the horrendous manner [in which] the investigation of the incident was handled by the defendant." (*Id.* ¶ 25.) Mr. Crawford "advised [Mr.] Guadalupe that he could not function at work as a result of the discriminatory and hostile actions caused by [Mr.] Bruno's racist behavior and, more importantly, by defendant's complete refusal to take any substantive actions against him." (*Id.*) Plaintiff asked Mr. Guadalupe for time off "to recuperate[] and deal with his stress, anxiety, and developing Post Traumatic Stress Disorder ('PTSD')." (*Id.* ¶ 26.) Mr. "Guadalupe responded that plaintiff would either have to take his own personal time or sick days to recuperate and declined to advise him of any other options available to him, such as FMLA." (*Id.*) Thereafter, Plaintiff used two weeks of his vacation time to "mange his stress, anxiety, and PTSD." (*Id.* ¶ 27.)

On November 6, 2011, Mr. Crawford met with manager Fred Fournier to request that he be removed from any shift in which he would have to work with Mr. Bruno. (*Id.* ¶ 23.) That

request was immediately denied. (*Id*.) "Shortly thereafter, [Mr.] Fornier met with [Mr.] Bruno and asked if he would have a problem working with the plaintiff." (*Id*.)

**B.  CHRO/EEOC Complaint**

On March 24, 2011,[2] Mr. Crawford filed a complaint against Amtrak with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"), alleging that he was harassed on February 9, 2011, and refused medical leave on March 18, 2011, because of his race.[3] (CHRO Charge, Ex. 1 to Mot. to Dismiss [Doc. # 35].) In his CHRO/EEOC complaint, he reiterated the allegations recited above regarding the February 9, 2011 email, the DRO investigation, Mr. Bruno's return to work, Mr. Crawford's supervisor's refusal to grant him leave, and harassment from co-workers who told Mr. Crawford that he should not have reported the incident with Mr. Bruno to Amtrak. (*Id*.) In addition, he stated, "[t]here have been numerous racially harassing incidents at Amtrak, including, but not limited to, racist comments placed on the locker of an African American male employee [and] the carving of a Black person with a noose in the bathroom in Train 173." (*Id*.) Mr. Crawford received a right-to-sue letter from the CHRO/EEOC on November 3, 2014. (2d Am. Compl. ¶ 7.)

---

[2] Plaintiff's Second Amended Complaint alleges that he filed this charge in 2014 (2d Am. Compl. ¶ 44), but he clarified at oral argument that this was a typographical error.

[3] Although the CHRO/EEOC charge is not attached to Plaintiff's Complaint, it is incorporated by reference, and is therefore deemed included in the Complaint. *Holloway v. King*, 161 F. App'x 122, 124 (2d Cir. 2005) ("[A] complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)) (internal quotation marks and citations omitted)).

### C.  Retaliation

"In the beginning of 2014, plaintiff's soon to be daughter-in-law, Cherie Francis, who is African American, . . . interviewed for a position with the defendant as a conductor, after passing the required exam." (*Id.* ¶ 45.) "Although she interviewed well, she was ultimately denied the position." (*Id.*) Instead, Amtrak hired a white conductor, "one of [Mr.] Bruno's nephews, Bobby Cotter." (*Id.* ¶ 46.) "A short time later," Amtrak hired "another one of [Mr.] Bruno's relatives, his niece," who is also white. (*Id.* ¶ 48.) "In hiring [Mr.] Bruno's relatives over plaintiff's, defendant . . . dramatically changed the work dynamic for plaintiff in that he now must interact with, not one, but a total of *three* members of the Bruno family tree who are connected by blood and share a mutual dislike of the plaintiff because of his African American race and color as well as the fact that he reported the overly discriminatory conduct of Bruno to the defendant." (*Id.* ¶ 49 (emphasis in original).)

### D.  The Lynched Doll

Four years after Plaintiff filed his CHRO/EEOC complaint, on April 11, 2015, an Amtrak employee left a doll with "a dark smudged face and a noose tied around its neck" in the Sign-up Room, where conductors and engineers receive their daily assignments. (*Id.* ¶¶ 36, 38.) "The doll was sitting above the daily work assignments and was conspicuously visible to every employee, including the plaintiff, when they came into the room to receive their daily assignments." (*Id.* ¶ 38.) An African-American co-worker of Plaintiff's "called the police to report the incident" and Plaintiff left a voicemail for Amtrak's Northeast Superintendent Mike Decatdalo, describing the incident. (*Id.* ¶ 39.) Mr. Decatdelo never responded. (*Id.*) Instead, Road Foreman Bill Ketterer called Plaintiff and instructed him that he had to "'follow the chain of command'" and that he did not trust Plaintiff. (*Id.*) "Since the incident with the doll, defendant has not investigated,

reprimanded, or attempted to identify the employee who staged, placed, or positioned the doll in the Sign-up Room." (*Id.* ¶ 40.) Further, "[t]he defendant has allowed racially insensitive remarks, bigoted speech, and violent behavior towards African Americans to become the norm for white employees at Amtrak." (*Id.* ¶ 41.)

## II.   Discussion[4]

### A.   Exhaustion

As a preliminary matter, Defendant contends that several of Plaintiff's claims should be dismissed because Plaintiff failed to exhaust his administrative remedies with respect to those claims.

Title VII requires that a plaintiff exhaust his administrative remedies by timely filing a complaint with the EEOC, obtaining a right-to-sue letter, and filing suit within ninety days of the receipt of that letter. 42 U.S.C. § 2000e-5(e)–(f). Exhaustion of administrative remedies is "an essential element [of a Title VII claim], and one with which defendants are entitled to insist that plaintiffs comply." *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000). The Second Circuit has explained that the purpose of the exhaustion requirement "is to encourage settlement of discrimination disputes through conciliation and voluntary compliance," and that goal "would be defeated if a complainant could litigate a claim not previously presented to and investigated by the EEOC." *Butts v. City of New York Dep't of Hous. Pres. and Dev.*, 990 F.2d 1397, 1401 (2d Cir.

---

[4] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

1993), *superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684 (2d Cir. 1998) (internal quotation marks omitted).

Here, Defendant argues that: (1) Count Two should be dismissed because Plaintiff did not assert a retaliation claim in his CHRO/EEOC charge (*id.* at 4); and (2) any claims regarding conduct occurring after March 2011 should be dismissed as unexhausted because they arise out of events that took place after the Plaintiff filed his CHRO/EEOC charge (*id.* at 5.).[5]

### 1. Count Two

Defendant asserts that Count Two should be dismissed because Plaintiff did not claim retaliation in his CHRO/EEOC charge. Plaintiff does not dispute that he never raised the retaliation allegation before, but he contends that the Court can nonetheless hear the claim. The Second Circuit has

> recognized three kinds of situations where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action. [The court has] loosely referred to these claims as 'reasonably related' to the allegations in the EEOC charge. . . .
>
> The first type of 'reasonably related' claim . . . is essentially an allowance of loose pleading. Recognizing that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims she is suffering, [the court] ha[s] allowed claims not raised in the charge to be brought in a civil action where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

---

[5] Defendant additionally argued in its Memorandum in Support of its Motion to Dismiss that Counts One and Two should be dismissed because Plaintiff failed to attach a right-to-sue letter to his Complaint. (Mem. Supp. at 4 n.3.) However, at oral argument, Defendant indicated that it is not pursuing this line of argument.

The second type of 'reasonably related' claim is one alleging retaliation by an employer against an employee for filing an EEOC charge. . . . [I]n such situations, [the Second Circuit] ha[s] relaxed the exhaustion requirement based on the close connection of the retaliatory act to both the initial discriminatory conduct and the filing of the charge itself. The EEOC already will have had the opportunity to investigate and mediate the claims arising from the underlying discriminatory acts alleged. . . . [R]equiring a plaintiff to file a second EEOC charge under these circumstances could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination.

The third type of reasonably related claim is where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge. . . . [In such cases,] the EEOC would have had the opportunity to investigate, if not the particular discriminatory incident, the method of discrimination manifested in prior charged incidents.

*Butts*, 990 F.2d at 1402–03 (internal quotation marks and citations omitted).

Courts "frequently invoke the 'reasonably related' doctrine when the factual allegations made in the administrative complaint can be fairly read to encompass the claims ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised." *Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir. 2008). Thus, in *Deravin v. Kerik*, 335 F.3d 195 (2003), the Second Circuit held that "the plaintiff's race discrimination claim was reasonably related to his EEOC charge of national-origin discrimination because 'read liberally, allegations by an African-American employee that employees of Irish descent are receiving preferential treatment implicitly suggests some form of potential racial discrimination in addition to an illegitimate preference premised on national origin.'" *Mathirampuzha*, 548 F. 3d at 77 (quoting *Deravin*, 335 F. 3d at 202).

Plaintiff here asserts that his retaliation claim is reasonably related to the claims he made in his EEOC charge, under either the "loose pleading" or the retaliation exception. It is apparent, however, that the loose pleading exception does not save Plaintiff's retaliation claim.

In his EEOC charge, Plaintiff alleged that his co-workers' racist and threatening behavior combined with Amtrak's refusal to take appropriate disciplinary action, created a hostile work environment. Those factual allegations, even liberally construed, cannot be fairly read to encompass a claim that Amtrak refused to hire Plaintiff's daughter-in-law in retaliation for his filing an EEOC charge, nor can Plaintiff's EEOC charge be said to have put Amtrak on notice that such a retaliation claim might be raised.

Whether Plaintiff has alleged a "close connection of the retaliatory act to . . . the initial discriminatory conduct," *Butts*, 990 F.2d at 1402, is a closer question. The initial discriminatory conduct alleged consisted of racist and threatening behavior by Plaintiff's co-workers towards him and other African-American employees and Amtrak's failure to take appropriate action to stop the harassment. The alleged retaliation was an unnamed Amtrak supervisor's decision to hire the white relatives of one of Plaintiff's harassers over Plaintiff's future daughter-in-law. While the Court similarly questions the closeness of the connection between these two claims, ultimately, for the reasons that follow, even if the Court deemed Plaintiff's retaliation claim exhausted, it would fail on the merits.

### 2.   Conduct which Occurred after March 2011

Defendant next asserts that Plaintiff's allegations concerning conduct that occurred after March 2011, when he filed his CHRO/EEOC complaint, should be deemed unexhausted. The conduct other than the alleged retaliation that occurred after March 2011 was Mr. Fourier's refusal to switch Plaintiff to a different shift in November 2011 and the display of the lynched

doll on April 11, 2015. Because Plaintiff did not raise by supplementation to his CHRO/EEOC complaint, any allegations about Mr. Fourier or the doll in his CHRO/EEOC complaint, the Court can only consider these claims if they are "reasonably related" to claims Plaintiff did make in his CHRO/EEOC complaint. Plaintiff asserts the claims are related on the grounds that he "has alleged a continuing violation of harassment that began with the 2011 incident and snowballed into more aggressive and persistent conduct after he filed his EEOC complaint." (Opp'n Mot. to Dismiss [Doc. # 36] at 8.)

Plaintiff misapprehends the applicability of the doctrine of "continuing violations," which is an "exception to the Title VII limitations period" that states that "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 155–56 (2d Cir. 2012) (internal quotation marks omitted). The doctrine has no application here, where Defendant has not alleged that any of Plaintiff's claims fall outside the statute of limitations period, but rather that Plaintiff has failed to exhaust his administrative remedies for claims that arose after Plaintiff filed an EEOC charge.[6]

---

[6] In a few cases, courts have referred to the continuing violation theory as an "exception to the exhaustion requirement," *see, e.g., Johnson-Memoli v. ADT Sec. Servs., Inc.*, No. 97 CIV. 5397 (DLC), 1998 WL 352591, at *2 (S.D.N.Y. June 26, 1998); *Johnson v. Frank*, 828 F. Supp. 1143, 1150 (S.D.N.Y. 1993), but the "exhaustion requirement" those courts referenced was the requirement that administrative remedies be exhausted within a certain period of time, i.e. the statute of limitations. *See, e.g., Tillman v. Luray's Travel*, No. 14-CV-105 (NGG) (JO), 2015 WL 5793501, at *6 (E.D.N.Y. Sept. 30, 2015) ("The continuing violation doctrine delays the tolling of the statutory exhaustion period until the last occurrence of a pattern of discriminatory practices."); *Norman v. Metro. Transit Auth.*, No. 13-CV-1183 (KAM) (JO), 2014 WL 4628823, at *4 (E.D.N.Y. Aug. 1, 2014) *report and rec. adopted sub nom. Norman v. Metro. Transp. Auth.*, No. 13-CV-1183 (KAM) (JO), 2014 WL 4628848 (E.D.N.Y. Sept. 15, 2014) (applying the continuing

Nonetheless, the Court could consider Mr. Fourier's refusal to move Plaintiff off Mr.

Bruno's shift and Plaintiff's co-worker's display of a lynched doll because they constitute further

allegations of "incidents of discrimination carried out in precisely the same manner alleged in the

EEOC charge." *Butts*, 990 F.2d at 1402; *see Saaidi v. CFAS, LLC*, 740 F. Supp. 2d 357, 365

(N.D.N.Y. 2010) ("[C]laims not explicitly referenced in an EEOC complaint, even those that

accrue after the filing of the complaint, are nonetheless viable where based on 'further incidents

of discrimination carried out in precisely the same manner alleged in the EEOC charge.'"

(quoting *Butts*, 990 F.2d at 1402)). "The relevant inquiry" in considering whether incidents of

discrimination fall under the "same manner" exception "is whether 'the EEOC would have had

the opportunity to investigate, if not the particular discriminatory incident, the method of

discrimination manifested in prior charged incidents.'" *Samimy v. Cornell Univ.*, 961 F. Supp.

489, 493 (W.D.N.Y. 1997) (quoting *Butts*, 990 F.2d at 1403); s*ee Abbate v. Cendant Mobility

Servs. Corp.*, No. CIV. 3-03-CV1858 (DJS), 2007 WL 2021868, at *11 (D. Conn. July 13, 2007)

("[The same manner exception effectuates] the purposes behind the exhaustion requirement . . .

because the EEOC has had the opportunity to investigate the means of discrimination as carried

out in the prior incidents.").

   *Almendral v. New York State Office of Mental Health* is instructive. 743 F.2d 963 (2d Cir.

1984). There, "[t]he Second Circuit held that incidents that occurred after [the] plaintiff had filed

her EEOC charge were 'essentially the same' as the conduct identified in her EEOC complaint,

---

violations doctrine to determine whether administrative exhaustion requirement was met for
conduct that arose more than 300 days before the plaintiff filed his EEOC complaint). That
argument is not applicable here, where there is no dispute that Plaintiff's EEOC filing was timely,
but additional claims accrued after that filing, about which he did not file a new EEOC
complaint.

even though the incidents differed, involving different schemes to exclude [the] plaintiff from consideration [for a promotion] ranging from performance reviews to delays in adding her [to] 'promotion-ready' lists, because they all involved the 'alleged manipulation of the civil service rules for discriminatory reasons in order to appoint someone other than [plaintiff].'" *DeBerry v. Brookdale Univ. Hosp. & Med. Ctr.*, 11 F. Supp. 3d 387, 394–95 (E.D.N.Y. 2014) (citing *Almendral*, 743 F.2d at 967).

Similarly, in *Boateng v. Apple Health Care, Inc*, the court held that the plaintiff's post-EEOC-complaint allegations were carried out in "precisely the same manner" as the allegations contained in her EEOC charge where each involved "abusive and harassing treatment by co-workers," albeit by different co-workers. 156 F. Supp. 2d 247, 252 (D. Conn. 2001); *see also Rommage v. MTA Long Island Rail Rd.*, No. 08-CV-836 (DLI) (ALC), 2010 WL 4038754, at *7 (E.D.N.Y. Sept. 30, 2010) aff'd, 452 F. App'x 70 (2d Cir. 2012) (finding that allegations that the plaintiff was unjustly disciplined and allegations that she was unjustly terminated were reasonably related under the "same manner" theory because both were allegations of unfounded discipline); *Dargento v. Bally's Holiday Fitness Centers*, 990 F. Supp. 186, 195 (W.D.N.Y. 1997) ("Because the EEOC charges filed by all plaintiffs paint a picture of a working environment permeated with hostility, both sexual and gender based, it is likely that the EEOC's investigation of the working environment at Bally's would have included the incidents described in Bruno's federal complaint," and therefore, these claims fall into the "precisely the same manner" exception).

Here, the essence of Plaintiff's hostile environment claim is that co-workers made overtly racist and threatening statements to Plaintiff and other African American employees and Amtrak failed to take appropriate disciplinary action. The allegations regarding Mr. Fourier and the

lynched doll involve "essentially the same . . . wrongful conduct" as alleged in the EEOC complaint. *Almendral*, 743 F.2d at 967. The Court therefore will consider these allegations in assessing the plausibility of Plaintiff's claims.

**B.   Count One (Hostile Work Environment)**

Turning to the merits, Defendant claims that Plaintiff has failed to state a claim for hostile work environment in violation of Title VII.

"A hostile work environment claim requires a showing [1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir. 1997) (alterations in original)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* "The standard for evaluating a hostile work environment claim is both subjective and objective: the victim must subjectively perceive the environment to be abusive so that it actually alters the conditions of the victim's employment, and the conduct must also be so pervasive or severe that a reasonable person would find the environment abusive." *Martires*, 596 F. Supp. 2d at 442 (citing *Torres v. Pisano*, 16 F.3d 625, 632 (2d Cir. 1997)); *see also Alfano*, 294 F.3d at 374.

"Harassed employees do not have to be Jackie Robinson, nobly turning the other cheek and remaining unaffected in the face of constant degradation. They are held only to a standard of reasonableness. Whenever the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, it is actionable

under Title VII, so long as the employee subjectively experienced a hostile work environment." *Torres*, 16 F.3d at 631–32 (footnote omitted).

"As a general rule, [however,] incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano*, 294 F.3d at 374 (internal quotation marks and citations omitted). Nonetheless, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile environment." *Id.* at 379.

"'[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "'[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Id.* (quoting *Harris*, 510 U.S. at 21). "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be . . . a steady barrage of opprobrious racial comments." *Id.* (internal quotation marks and citations omitted).

Defendant here contends that Plaintiff has failed to plausibly claim the existence of a hostile work environment because: (1) the Court cannot consider allegations of discrimination relayed to the Plaintiff by others (*see* Mem. Supp. at 7, 10); (2) Plaintiff has not pled adequate facts from which the existence of a hostile work environment can plausibly inferred (*see id.* at 8–10); and (3) Plaintiff's co-workers' conduct cannot be imputed to Amtrak (*id.* at 8).

### 1.   Hearsay Allegations

Citing *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 182 (2d Cir. 2001), Amtrak contends that allegations based on hearsay "cannot support a hostile work environment claim." (Mem. Supp. at 10.) Amtrak's position is concerning since it patently misrepresents the holding

of *Leibovitz* and the law in the Second Circuit. As conceded by Amtrak at oral argument, what the court in *Leibovitz* held was *not* that allegations based on hearsay are irrelevant to a hostile work environment claim (indeed, it held the opposite) but rather that a hostile work environment claim cannot be based *solely* on hearsay allegations. *Leibovitz*, 252 F.3d at 190. In the Second Circuit's words:

> We hold that Leibovitz—who was not herself a target of the alleged harassment, was not present when the harassment supposedly occurred, and did not even know of the harassment while it was ongoing—failed to prove that an environment existed at work that was hostile to her because of her sex.
>
> In so holding, we recognize that evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination. "Because the crucial inquiry focuses on the nature of the workplace environment *as a whole*, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."

*Id.* (emphasis in original) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)); *see also Schwapp*, 118 F.3d at 111–12 ("The mere fact that Schwapp was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim. Just as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, the fact that a plaintiff learns second-hand of a racially derogatory joke by a fellow employee or supervisor also can impact the work environment. . . . Whether Schwapp was aware of [incidents relating to other minorities and incidents occurring before Schwapp's tenure] during his employment, and, more significantly, whether in light of these incidents, the incidents Schwapp experienced more directly would reasonably be perceived, and were perceived, as hostile or abusive are factual issues that should be resolved by a trier of fact." (internal quotation marks, brackets, and citations omitted)); *Torres*, 116 F.3d at 633 ("The

fact that many of Coe's statements were not made in Torres's presence is, in this case, of no matter; an employee who knows that her boss is saying things of this sort behind her back may reasonably find her working environment hostile."); *Perry*, 115 F.3d at 151 ("Evidence of the harassment of women other than Perry, if part of a pervasive or continuing pattern of conduct, was surely relevant to show the existence of a hostile environment at Ethan Allen and could have been found probative of the company's notice of that environment within the period that the district court viewed as relevant.").

Here, as in the above-cited cases, the mere fact that Mr. Crawford was not present for all of the racist comments made by his co-workers; that not all of the racist conduct was directed at Mr. Crawford specifically; or that Mr. Crawford may have learned of some racist or harassing behavior from a co-worker rather than experiencing it directly, does not make his allegations regarding that conduct irrelevant to his hostile work environment claim.

### 2.  Hostile Work Environment

Amtrak next asserts that the conduct alleged by Plaintiff "was not sufficiently severe and pervasive to support a hostile work environment claim." (Mem. Supp. at 8.) The alleged conduct consists of the following:

- February 9, 2011 email: "Just thought u might like to kiss my ass . . . nigger." (2d Am. Compl. ¶ 11.)

- February 13, 2011: co-worker commented, "I don't see what the problem is; they call each other ['nigger'] all the time anyway!" (*Id.* ¶ 29.)

- "In or around 2011:" white colleagues used the word "Nigger;" stated that "'the N word' was [not] a big deal because 'black people call each other Niggers all the time.'" (*Id.* ¶ 32.)

- Early 2011: white co-workers warned/threatened Plaintiff not to file a complaint against Mr. Bruno. (*Id.* ¶ 24.)

- February 15, 2011: white co-worker threatened Plaintiff, warning that Mr. Crawford and his son will "'have a very tough time out here, because Bruno is very well liked out here.'" (*Id.* ¶ 30.)

- February 24, 2011: white conductor threatened Plaintiff, stating "there [i]s a 'Brotherhood around here.'" (*Id.* ¶ 31.)

- March 18, 2011: Plaintiff told supervisor Guadalupe that "he could not function at work" due to stress, anxiety, and PTSD resulting from the Bruno incident. (*Id.* ¶ 25.) "Guadalupe responded that plaintiff would either have to take his own personal time or sick days to recuperate and declined to advise him of any other options available to him, such as FMLA." (*Id.* ¶ 26.)

- November 6, 2011: manager Fred Fournier "immediately denied" Plaintiff's request not to work with Bruno and shortly thereafter met with Bruno to ask if he would have a problem working with Plaintiff. (*Id.* ¶ 23.)

- Many white co-workers "have refused to speak with [Plaintiff] because he complained of Bruno's racist behavior to DRO." (*Id.* ¶ 33.)

- "[W]hite employees have repeatedly engaged in racially insensitive and, in some cases, obtrusive discriminatory behavior . . . ." (*Id.*)

- April 11, 2015: Amtrak employee left a doll with "a dark smudged face and a noose tied around its neck" in the Sign-up Room, where conductors and engineers receive their daily assignments. (*Id.* ¶¶ 36, 38.)

- Racially insensitive remarks, bigoted speech, and violent behavior towards African Americans have become the norm at Amtrak. (*Id.* ¶ 41.)

Taking, as the Court must, these allegations as true, Plaintiff has made out a colorable claim of the existence of a hostile work environment. Because the harassment alleged here "is of such quality or quantity that a reasonable employee would find the conditions of [his] employment altered for the worse," and Plaintiff has subjectively experienced a worsening of his working conditions, his claim is "actionable under Title VII." *Torres*, 16 F.3d at 632. While

several of Plaintiff's allegations are non-specific, such as his claims that "white employees have repeatedly engaged in racially insensitive and, in some cases, obtrusive discriminatory behavior" (2d Am. Compl. ¶ 33), and that racially insensitive remarks, bigoted speech, and violent behavior towards African Americans have become the norm at Amtrak (*id.* ¶ 41), "[i]f a jury were to credit [these] general allegations of constant abuse, . . . it could reasonably find pervasive harassment, even in the absence of specific details about each incident," *Torres*, 16 F.3d at 631.

This is particularly so because unlike the cases cited by Amtrak (*see* Mem. Supp. at 10; Reply [Doc. # 37] at 3), the alleged harassment here goes beyond a few uses of the "n word" by a single co-worker. Rather, Mr. Crawford alleges that multiple co-workers used the word, made veiled threats to Plaintiff (with, for example, the reference to the "Brotherhood" of whites) and other black employees (the lynched doll), and generally behaved hostilely toward him because of his race, and that his attempts to get assistance from his supervisors were met with indifference. Together, these allegations sufficiently allege the existence of a hostile work environment.

### 3.  Amtrak's Liability

 "Once a plaintiff has established the existence of a hostile workplace, she must then demonstrate that the harassing conduct which created the hostile situation should be imputed to the employer." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998) (internal quotation marks omitted). Where, as here, "harassment is perpetrated by [a] plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either [1] provided no reasonable avenue for complaint," *Perry*, 115 F.3d at 149 (internal quotation marks omitted), or (2) "knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action," *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004); *see also Christy v. Ken's Beverage, Inc.*, 660 F. Supp. 2d 267, 275 (D. Conn. 2009) (same).

Amtrak contends that liability cannot be imputed to it because "Plaintiff has not alleged that Amtrak failed to provide a reasonable avenue for him to bring his complaint regarding Bruno or that Amtrak knew of harassment but did nothing about it." (Mem. Supp. at 8.) Rather, "Plaintiff admits that he reported the [email] incident to Steven Sievert with Amtrak's Dispute Resolution Office and that Amtrak immediately placed Bruno on administrative leave while investigating Plaintiff's claims." (*Id.*).

Plaintiff responds that Mr. "Bruno's conduct can be imputed to the defendant based on [1] Amtrak's failure," in refusing to terminate Mr. Bruno, "to follow its own 'zero tolerance' discrimination policy," and (2) Amtrak's failure to "investigate related incidents of other employees engaging in threatening or conspicuously racist behavior." (Opp'n at 11.)

As clarified at oral argument, Plaintiff does not claim that Amtrak provided no reasonable avenue for complaint, so the only question is whether the Second Amended Complaint plausibly alleges that Amtrak "knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action," *Petrosino*, 385 F.3d at 225. The reasonableness of Amtrak's response must be "assessed from the totality of circumstances. Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment." *Distasio*, 157 F.3d at 65; *see also Torres*, 116 F.3d at 638. "'Title VII does not require that an employer fire all the "Archie Bunkers" in its employ,'" *Dobrich v. General Dynamics Corp., Elec. Boat Div.*, 106 F. Supp. 2d 386, 393 (D. Conn. 2000) (quoting *Torres*, 116 F.3d at 633–34 n.7), but "it does require the employer to take prompt and adequate measures to address the harassment that has occurred," *id.*

With respect to Mr. Bruno's email, Plaintiff admits that after he reported the incident, Mr. Bruno was promptly suspended for thirty days, but he contends that this suspension was inadequate, as evidenced by the continuing incidents of racial harassment that followed the suspension. Even if a reasonable jury could find Amtrak's response to Mr. Bruno's email inadequate, Plaintiff has not alleged any facts from which it can be inferred that Amtrak knew or reasonably should have known about the harassing behavior of Plaintiff's other co-workers in the weeks, months, and years following the email. That leaves Plaintiff with the 2011 email and the 2015 lynched doll incident, and, contrary to Plaintiff's contention at oral argument, these two incidents—separated by several years—cannot be said to more than episodic. Imputing Defendant's liability for creating or permitting the creation of a hostile work environment has not, therefore, been plausibly alleged, and Count One is dismissed.

### C.  Count Two (Retaliation)

In order to make out a colorable claim of retaliation under Title VII, a plaintiff must allege that: (1) she participated in a protected activity, (2) the defendant knew of her participation in the protected activity, (3) she suffered an adverse employment action, and (4) there exists a causal connection between the protected activity and the adverse employment action. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). "Title VII's anti-retaliation provision applies broadly to 'employer actions that would have been materially adverse to a reasonable employee or job applicant.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *White*, 548 U.S. at 57).

Plaintiff contends that Amtrak retaliated against him for filing the CHRO/EEOC complaint by refusing to hire his future daughter-in-law and instead hiring two of Mr. Bruno's relatives. (Opp'n at 26.) Amtrak's response is two-fold: (1) as a matter of law, an action taken against Mr. Crawford's daughter-in-law cannot be considered a materially adverse action against him; and (2) Plaintiff has failed to allege any causal link between his exercise of his rights under Title VII and Amtrak's refusal to hire his daughter-in-law. (Mem. Supp. at 11–12.)

### 1. Action against Family Member

In support of its assertion that Amtrak's refusal to hire Plaintiff's relative cannot, as a matter of law, constitute an adverse action against Plaintiff, Amtrak cites a single case, *Vendryes v. Potter*, No. 3:07cv1747 (CFD), 2009 WL 1884000, at *11 (D. Conn. June 30, 2009). Contrary to Amtrak's representation that the court in *Vendryes* concluded "that an employer's failure to hire a plaintiff's twin sister . . . was no[t] retaliatory" (Reply at 5–6), as Amtrak acknowledged at oral argument, Judge Droney in fact held that the plaintiff's retaliation claim was "barred as not properly exhausted," and in any event that the claim failed because plaintiff had not alleged that the employer had been "motivated by her status as member of a class protected by Title VII," *Vendryes*, 2009 WL 1884000, at *11. Judge Droney explicitly declined to address whether "the claim that plaintiff's sister was not offered employment . . . could be construed as retaliation against the plaintiff." *Id.*

The Supreme Court, however, did squarely address this issue in 2011, when it held that a company's firing of an employee's fiancé in retaliation for that employee's engagement in Title VII-protected activity constituted unlawful retaliation under Title VII. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011).

Amtrak attempts to distinguish *Thompson* by noting that the case concerned the ability of a plaintiff to bring a retaliation suit against his employer under Title VII where the employer retaliated against the plaintiff for the plaintiff's fiancé's protected activity. (*See* Def.'s Suppl. Br. [Doc. # 39].) Although Amtrak's characterization of the factual context of *Thompson* is accurate, Amtrak ignores the Supreme Court's express holding that the employer's firing of Thompson constituted unlawful retaliation for his fiancé's protected activity:

> We think it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired. . . . NAS raises the concern, however, that prohibiting reprisals against third parties will lead to difficult line-drawing problems concerning the types of relationships entitled to protection. Perhaps retaliating against an employee by firing his fiancé would dissuade the employee from engaging in protected activity, but what about firing an employee's girlfriend, close friend, or trusted co-worker? Applying the *Burlington* standard to third-party reprisals, NAS argues, will place the employer at risk any time it fires any employee who happens to have a connection to a different employee who filed a charge with the EEOC.
>
> Although we acknowledge the force of this point, we do not think it justifies a categorical rule that third-party reprisals do not violate Title VII. As explained above, we adopted a broad standard in *Burlington* because Title VII's antiretaliation provision is worded broadly. We think there is no textual basis for making an exception to it for third-party reprisals, and a preference for clear rules cannot justify departing from statutory text.

*Thompson*, 562 U.S. at 174–75. Likewise, here, it is clear that a reasonable worker might be dissuaded from engaging in protected activity if he knew that his daughter-in-law would not be hired in retaliation for his exercise of his rights under Title VII.[7]

---

[7] Amtrak also attempts to distinguish *Thompson* by contending that it is inapplicable on its face because Mr. Crawford's relationship to the relative against whom Amtrak retaliated was not sufficiently close. The *Thompson* court, however, explicitly "decline[d] to identify a fixed class of relationships for which third-party reprisals are unlawful," instead explaining that "the significance of any given act of retaliation will often depend upon the particular circumstances."

### 2. Causal Link

Plaintiff's retaliation claim nonetheless fails because Plaintiff has not adequately alleged a causal link between his filing of a CHRO/EEOC complaint in 2011 and Amtrak's refusal to hire his daughter-in-law in 2014. Plaintiff's complaint is lacking in several respects. First, Plaintiff has not alleged that the Amtrak supervisor who interviewed Plaintiff's daughter-in-law, Cherie Francis, was aware of Plaintiff's complaint, filed three years previously, or that he or she was aware that Ms. Francis, who does not share Plaintiff's surname, was his daughter-in-law. Moreover, Plaintiff does not allege that Ms. Francis was at least as qualified for the position of conductor as Mr. Bruno's nephew, who was ultimately hired. Absent any of these allegations, and in light of the three-year gap between Plaintiff's filing of his complaint and Ms. Francis's application for the conductor position, Plaintiff's complaint cannot be read to allege a plausible retaliation claim. Therefore, Count Two is dismissed.

### D. Count Three (Intentional Infliction of Emotional Distress)

As an initial matter, the parties dispute whether federal or state law applies to Plaintiff's intentional infliction of emotional distress ("IIED") claim. Amtrak, citing only out-of-Circuit caselaw, maintains that federal law, namely the Federal Employers' Liability Acts ("FELA"), provides Plaintiff's exclusive remedy. (Mem. Supp. at 12; Reply at 7.) Plaintiff acknowledges that "FELA is generally the exclusive remedy for a plaintiff to pursue most tort claims (Opp'n at 14), but he contended at oral argument, without citation to authority, that FELA only preempts negligence claims. In fact the resolution of this issue is dictated by *Rogers v. Consol. Rail Corp.*, 948 F.2d 858, 860 (2d Cir. 1991), in which the Second Circuit recognized that "[i]t is . . . well-

---

*Id.* at 175 (internal quotation marks omitted). Because this is a fact-specific inquiry, it is not appropriately resolved at the motion to dismiss stage.

settled that Congress explicitly directed that FELA wholly preempt state-law remedies for railway employees injured in the course of employment when any part of that employment furthers interstate commerce."[8] FELA, and not Connecticut law, is therefore the applicable law here.[9]

FELA provides that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while employed by such carrier . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. Under Second Circuit and Supreme Court precedent, IIED claims are cognizable

---

[8] Amtrak argues [Doc. # 39] (seemingly against its own interests) that *Rogers* is in fact not applicable here because the case concerned the extraterritorial application of FELA. Although this is true, before reaching that issue, the Second Circuit observed that:

> [i]t is now well-settled that Congress explicitly directed that FELA wholly preempt state-law remedies for railway employees injured in the course of employment when any part of that employment furthers interstate commerce. *See New York Cent. R.R. Co. v. Winfield*, 244 U.S. 147, 151–52 (1917)[("That the act is comprehensive and also exclusive is distinctly recognized in repeated decisions of this court.")]; *see also* H.R.Rep. No. 1386, 60th Cong., 1st Sess. 3 (1908) (FELA "will supplant the numerous State statutes on the subject so far as they relate to interstate commerce"). Thus, if FELA applies to the Rogers' state-law claims, it preempts them.

948 F.2d at 860.

[9] Amtrak contends, without citation to any authority, that Plaintiff's claims should be dismissed because his complaint does not cite FELA. (Mem. Supp. at 12–13.) Although it is undoubtedly the better practice to cite specific laws in a complaint, Rule 12 only requires that a complaint contain sufficient "factual content" to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Haight v. NYU Langone Med. Ctr., Inc.*, No. 13 CIV. 04993 (LGS), 2014 WL 2933190, at *14 (S.D.N.Y. June 27, 2014) (denying a motion to dismiss where the complaint also asserted "a claim against NYU for sexual harassment under a theory of hostile work environment, but d[id] not specify a specific law."); *Shabtai v. Levande*, No. 13 CV 4580 (ENV), 2013 WL 6116850, at *2 (E.D.N.Y. Nov. 20, 2013) ("Although plaintiff fails to identify the specific law(s) pursuant to which she brings this suit, liberally construed, the complaint alleges a violation of plaintiff's constitutional rights under 42 U.S.C. § 1983.").

under FELA, *see Higgins v. Metro-North R. Co.*, 318 F.3d 422, 425 (2d Cir. 2003), and are assessed using the zone of danger test, *see Goodrich v. Long Island R.R. Co.*, 654 F.3d 190, 199 (2d Cir. 2011).

"Perhaps based on the realization that a near miss may be as frightening as a direct hit, the zone of danger test limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." *Gottshall*, 512 U.S. at 547–48 (internal quotation marks and citations omitted). "Under this test, a worker within the zone of danger of physical impact will be able to recover for emotional injury caused by fear of physical injury to himself, whereas a worker outside the zone will not. Railroad employees will thus be able to recover for injuries— physical and emotional—caused by the negligent conduct of their employers that threatens them imminently with physical impact." *Id.* at 555.

Although the precise contours of what constitutes a "physical impact" are still being defined, the Supreme Court has held that as a matter of law, an employee who suffers a nervous breakdown as a result of stressful working conditions has not suffered a "physical impact," *id.* at 558, nor has an employee who has been exposed to asbestos and learns he may become ill after a substantial period of time, *Metro-North Commuter R. Co. v. Buckley*, 521 U.S. 424, 432 (1997).

In discussing his IIED claim under FELA, Plaintiff appears to conflate it with his NIED claim, contending that Amtrak "engaged in negligent conduct by not terminating Bruno and, when he returned to work, by refusing to allow the plaintiff to transfer to a new shift." (Opp'n at 36.) There is no question that this allegation is insufficient to make out a claim for IIED under FELA. Plaintiff has not alleged that he sustained any physical impact, as that term has been defined by the Supreme Court, due to Defendant's conduct, nor has he plausibly alleged that he

was placed in immediate risk of physical harm by Defendant's conduct. For this reason, Count Three is dismissed.

**III.    Conclusion**

For the foregoing reasons, Defendant's Motion [Doc. # 34] to Dismiss is GRANTED. The Clerk is requested to close this case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 4th day of December, 2015.